## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

COREY WILLIAMS and
DANYELLE WILIAMS,

     Plaintiffs,

v.

DANIEL MCCAW II, NICHOLAS
HOFER, UNKNOWN GUSHEN, and
the CITY OF WARREN

     Defendants.

No.

Hon.

_____/

OLIVER BELL GROUP
Paul Matouka (P84874)
50 W. Big Beaver Rd.
Suite 200
Troy, MI 48084
(248) 327-6556
notifications@oliverlawgroup.com
_____/

### COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs Corey Williams and Danyelle Williams by and through their counsel, Oliver Bell Group, and for their Complaint allege the following:

### INTRODUCTION

1. Defendant City of Warren has well-earned reputation in Southeast Michigan for having a police force that routinely engages in racial profiling, excessive force, and other unconstitutional acts.

2.  This case is just one example of why that reputation exists – as the facts below paint a harrowing picture of three White Warren Police officers beating a handicapped Black man on his wedding night and dislocating his arm.

## PARTIES

1. Plaintiff Corey Williams is a resident of Macomb County, Michigan.

2. Plaintiff Danyelle Williams is a resident of Macomb County, Michigan.

3. Defendant Daniel McCaw II was, at all times relevant to the allegations in this Complaint, a police officer employed by Defendant City of Warren.

4. Defendant Unknown Gushen was, at all times relevant to the allegations in this Complaint, a police officer employed by Defendant City of Warren.

5. Defendant Nicholas Hofer was, at all times relevant to the allegations in this Complaint, a police officer employed by Defendant City of Warren.

6. Defendant City of Warren is a municipality within the Eastern District of Michigan. Plaintiffs do not seek punitive damages against Defendant City of Warren.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff's claims arise under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

8. This Court has jurisdiction over Plaintiffs' State law claims pursuant to 28 U.S.C. § 1367 as they arise out of the same transaction or occurrence.

9. Venue is proper before this Court pursuant to 28 U.S.C. § 1391 as all the events giving rise to this complaint occurred in the Eastern District of Michigan.

## FACTUAL ALLEGATIONS

10. As a result of an old gunshot wound to his head, Plaintiff Corey Williams has a diagnosed neurological disability that significantly impacts his mobility.

11. As a result, Mr. Williams generally uses a cane to move around.

12. Mr. Williams can walk without a mobility aid, but it is difficult for him to do so.

13. Additionally, when standing up, Mr. Williams needs to steady himself using his hands to avoid falling over and injuring himself.

14. Mr. Williams also has a disability license plate for his vehicle.

15. On September 22, 2024, Mr. Williams got married to Danyelle Dunbar (now Williams).

16. After returning home from the wedding, Mr. Williams drove to the gas station to get a pop for his new wife.

17. Mr. Williams rushed home from the gas station.

18. Unfortunately for Mr. Williams, Defendant McCaw saw him "make an abrupt turn" and decided to follow him.

19. Defendant Gushen was in the patrol vehicle with Defendant McCaw.

20. Defendants McCaw and Gushen followed Mr. Williams down a residential street and initiated a traffic stop based on the claim that Mr. Williams was speeding and made a rolling stop at a stop sign.

21. When Defendant McCaw activated his patrol vehicle's emergency lights to initiate a traffic stop, Mr. Williams was at a yield sign three to four houses from his destination with limited options for parking on the right-hand side of the road.

22. Mr. Williams pulled his car into the driveway of his house, coming to a complete stop less than thirty seconds after Defendant McCaw first turned on his emergency lights.

23. Mr. Williams, a black man with a prior criminal history, tried to ensure his personal safety by opening the door of his vehicle and completely sticking his arms out.

24. Mr. Williams, like so many other people, had seen how startled, confused, or scared police officers often shoot first and ask questions later.

25. He believed that showing both of his hands – away from anything Defendants could claim was a weapon – would prevent him from being wrongfully injured.

26. Mr. Williams did this in part because he and his wife had been warned about the propensity of Warren Police officers to target Black men and their unhealthy penchant for unnecessary violence.

27. Unfortunately, Mr. Williams was in Warren, and these were Warren Police Officers – he would soon learn there was no safe action.



Fig. 1: Screen capture from the dash camera of Defendant McCaw's patrol vehicle of Mr. Williams showing his hands.



Fig. 2: Screen capture from Defendant McCaw's body camera of Mr. Williams showing his hands.

28. Defendant McCaw initially attempted to accuse Mr. Williams of fleeing the traffic stop.

29. Mr. Williams correctly indicated that he had not been fleeing.

30. Having failed to gin up a fleeing and eluding charge, Defendant McCaw took a new approach and instructed Mr. Williams to get out of his vehicle stating "since you want to come out, come on out."

31. Mr. Williams offered to provide his license and registration.

32. Defendant McCaw was disinterested in obtaining Mr. Williams' license and registration, stating "I didn't ask you for anything, I asked you to step out of the car."

33. Later at the Warren Jail, Defendant McCaw would tell Mr. Williams that he did not ask for license and registration because "I didn't have time as I explained out there because you were trying to get out of the car."

34. Defendant McCaw had ample time to ask for Mr. Williams license and registration – he made a conscious decision to escalate the situation instead.

35. Later, in response to Mr. Williams asking if this was procedure for routine traffic stops non-party detective D. Rexford states, "Uhh, as far I know, no that's not normally routine."

36. Defendant Gushen would also later tell Mrs. Williams that if Mr. Williams "had he just stopped and given us his driver's license, he'd be going home with his new wife today. But now, he's going to jail."

37. Defendant McCaw instructed Mr. Williams to get out of his car and reached in to grab him.

38. Mr. Williams told Defendant McCaw not to touch him and pulled his body away.

39. Less than twenty seconds after he opened the door to exit his patrol vehicle, Defendant McCaw grabbed Mr. Williams arm.

40. Twenty seconds after Defendant McCaw opened the door of his patrol vehicle, he instructed Mr. Williams that he was under arrest for refusing to obey a police command and began pulling his arm out of the car.

41. Twenty-six seconds after Defendant McCaw opened the door of his patrol vehicle, Mr. Williams clearly states "I am handicapped bro."

42. Thirty seconds after opening the door to his patrol car, Defendant McCaw informed Mr. Williams, "You've had several opportunities to step out."

43. Defendant McCaw just keeps yelling "step out".

44. Mr. Williams then said, "I am handicapped bro, I'm going to abide."

45. Defendant McCaw then started aggressively telling Mr. Williams to "stop resisting".

46. During this period, Mr. Williams honked his vehicle's horn to try and get help from Mrs. Williams, his neighbors, or anyone who could intervene.

47. Mrs. Williams, who had been in the shower, heard the horn and came outside.

48. Defendant McCaw never gave Mr. Williams a chance to exit his vehicle in a safe manner.



Fig. 3: Screen capture from Defendant Gushen's Body camera of the moment Defendant McCaw begins telling Mr. Williams to "stop resisting" – just seconds after Mr. Williams stated "I'm handicapped bro, I'm gonna abide."

49. Defendant Gushen, having observed this entire encounter, determined that it is something he should get involved in.

50. Mrs. Williams can be heard on the body camera footage informing Defendants that Mr. Williams is handicapped.

51. One of the Defendants responds, "Yeah he keeps saying that but he won't get out of the car."

52. As Defendants drag Mr. Williams out of his car headfirst, he can repeatedly be heard telling them he is handicapped until he is reduced to screaming in pain.

53. During the struggle Mr. Williams yells "give me a chance."

54. Defendants did not give Mr. Williams a chance.

55. Mrs. Williams can be heard pleading with Defendants that Mr. Williams is handicapped and there is specifically an issue with his legs.

56. This is when Defendant Hofer arrived.

57. After Defendants McCaw and Gushen dragged Mr. Williams to the edge of his seat, Defendant Gushen pulls his shirt over his head.

58. At approximately 2:30 into Defendant Gushen's body camera footage you can hear Mr. Williams saying "Bro, bro, I can't".

59. Defendant Gushen then delivers a right hook to the back of Mr. Williams head.

60. Defendant Hofer's body camera captured the right hook to Mr. Williams head at approximately 41 seconds.

61. Mr. Williams is then dragged face first onto the ground outside his car.

62. Defendant McCaw found the courage to say, "we tried to help him four times we told him to get out of the car."

63. While being handcuffed by Defendants Mr. Williams can be heard crying "you're breaking my arm."

64. At this point, Defendants Hofer and McCaw have control over Mr. Williams right arm

65. Mr. Williams then informs the Defendants, "you broke my arm."

66. Defendant McCaw and another Defendant[1] both responded "nobody broke anything."

67. Defendant McCaw and the other officer were technically correct because a dislocated elbow is not a broken bone.

68. Defendants dislocated Mr. Williams right elbow.

69. Mr. Williams was then carried by his arms and legs – including his right arm with a dislocated elbow – and shoved into the back of a patrol vehicle.

70. While being shoved into the patrol vehicle, Mr. Williams again informed Defendants that he was handicapped, to which Defendant McCaw responded, "Then where is your wheelchair?"

71. Defendants McCaw and Gushen both heard Mr. Williams say "I'm handicapped, I'll abide."

72. In his report on the incident, Defendant Gushen wrote:

> I observed Williams state 'I'm handicap bro' and state he would comply, but still ignored verbal commands by Officer McCaw to exit the vehicle. I observed Williams repeatedly stated [sic.] that he was handicap and that he was 'going to abide' and then suddenly attempt to pull his left arm away from Officer McCaw's control.

---

[1] It is unclear from the body camera footage whether it was Gushen or Hofer.

73. As seen in figure 3 above, Defendant McCaw already had control of Mr. Williams' left arm when Mr. Williams informed him that he was handicapped and would comply.

74. Mr. Williams needed the use of his arm to exit the vehicle due to his handicap.

75. Mr. Williams was unable to safely comply with Defendant McCaw's order to exit the vehicle without the use of his arm.

76. Had Defendant McCaw let go of Mr. Williams arm and taken a step back, Mr. Williams would have been able to exit the vehicle in compliance with the order.

77. Both of the Williams attempted to explain this to Defendants McCaw and Gushen, who chose to ignore it in their bloodlust.

**Defendant City of Warren**

78. The City of Warren has a long history of police applying excessive force.

79. For example, in 2023 Warren Police officer Matthew Rodriguez viciously beat an inmate resulting in him pleading guilty to federal charges.

80. Also in 2023, Defendant City of Warren entered into a $400,000 settlement to resolve claims stemming from an incident where Warren Police officers tacked and tased an unresisting person outside of their jurisdiction.

81. There have been numerous other incidents involving Warren Police officers and applications of excessive force in the years preceding the violation of Mr. Williams' constitutional rights.

82. These previous incidents, and the violation of Mr. Williams' Constitutional rights, stem from Defendant City of Warren's policy of inadequately training its officers on the appropriate application of force.

83. Upon information and belief, Defendant City of Warren failed to provide any training to its officers on handling handicapped suspects.

84. Evidence of this comes in the form of:

    a. Defendant McCaw's apparent belief that a person cannot be handicapped without a wheelchair;

    b. Defendants failure to recognize that some handicapped people while able to stand and walk with a limp, require support to do so safely.

    c. Defendant Hofer claiming that "he can stand up, he doesn't have a wheelchair, his legs work."

    d. Defendant Hofer asking how Mr. Williams can drive a car if he is handicapped; and

    e. The fact that none of the Defendants stopped to ask what his disability was and what he needed in order to comply with their commands.

85. Upon information and belief, Defendant City of Warren has a custom or policy of having its officers grab people who are still in their vehicles *before* there has been adequate time for the individual to exit the vehicle.

86. As normal humans are inclined to do when a stranger reaches inside a vehicle to grab them without warning, people often recoil from the attempt to grab them.

87. Upon information and belief, Warren Police are trained to recognize this as resisting arrest and/or disobeying a police order and to escalate their use of force.

88. This custom or policy increases incidents of violence and allows police officers employed by Defendant City of Warren to escalate any misdemeanor traffic stop into a felony resisting and obstructing.

89. Moreover, in situations where an individual is handicapped and requires the use of his or her arms to exit the vehicle it prevents them from being able to comply with the command.

90. Defendant City of Warren has long maintained an unconstitutional policy of discrimination against people of color. *See, e.g.*, Jameson Cook, *Former Black female Warren cop wins over $500,000 in gender, racial bias case*, MACOMB DAILY (May 5, 2023) *available at https://www.macombdaily.com/2023/05/05/former-black-female-warren-*

*cop-wins-over-500000-in-gender-racial-bias-case/*; Jack Nissen, *Warren police officer fired after making racist comments on Facebook*, Fox 2 Detroit (June 22, 2021) *available at https://www.fox2detroit.com/news/warren-police-officer-fired-after-making-racist-comments-on-facebook*; *Former Warren police officer who assaulted a black man after an arrest pleads guilty*, CBS News Detroit (Apr. 8, 2024) *available at https://www.cbsnews.com/detroit/news/warren-police-officer-who-assaulted-a-black-man-after-an-arrest-pleads-guilty/*.

91. Mrs. Williams also spoke with a nurse who treated Mr. Williams injuries who told her that the people brought into the hospital for treatment by the Warren Police Department were overwhelmingly Black.

92. This discriminatory custom has infected the ranks of the Warren Police Department and instilled a feeling of impunity when it comes to the rights of Black citizens in Warren.

### Injuries

93. As a result of the conduct of Defendants McCaw, Gushen, and Hofer based on the customs and policies of Defendant Warren, Mr. Williams suffered:

    a. A dislocated elbow that required medical intervention;

    b. Significant physical pain and suffering from the excessive force;

    c. Humiliation and degradation in front of his wife;

    d.  Significant emotional and mental pain;

    e.  Lost wages due to missed work;

    f.  Damage to the paint on his car doors; and

    g.  Out of pocket expenses associated with treating his injuries.

94. As a result of the outrageous conduct of Defendants McCaw, Gushen, and Hofer, Mrs. Williams experienced significant mental and emotional pain and suffering.

95. The Williams' plan to move from Warren because they live in fear of the police after this incident.

96. The Williams' wedding anniversary is also the anniversary of Mr. Williams being beaten by Defendants.

## COUNT I: 42 U.S.C. § 1983 – Fourth Amendment Unreasonable Seizure and Excessive Force (Mr. Williams)

97. Plaintiff realleges and reincorporates the preceding paragraphs as if fully restated herein.

98. Defendant Gushen had an affirmative obligation to prevent Defendant McCaw from applying excessive force to Mr. Williams.

99. Defendant Gushen failed to prevent Defendant McCaw from applying force, deciding instead to join in on the Constitutional violation.

100.    There was no justification for Defendant Gushen to deliver a right hook to the back of Mr. Williams' head.

101.    Regardless of whether Defendant McCaw had a valid basis to seize Mr. Williams, he applied excessive force by attempting to drag Mr. Williams out of the vehicle before giving him a chance to comply.

102.    This was a result of Defendant City of Warren's policy of training its officers to immediately seize individuals who are ordered out of a vehicle, without giving them time to comply.

103.    Moreover, Defendants McCaw and Gushen were both aware that Mr. Williams was handicapped – both from the Williams' pleas and the presence of a disability license plate on Mr. Williams' vehicle.

104.    Defendants McCaw and Gushen failed to acknowledge Mr. Williams' handicap due to a lack of training by Defendant City of Warren.

105.    Defendants McCaw and Hofer collectively applied excessive force when they dislocated Mr. Williams elbow while he was screaming that they were breaking his arm.

106.    These actions were caused by Defendant City of Warren's long-standing policy of discrimination towards people of color, in particular by the Warren Police Department.

107.    Mr. Williams suffered the injuries described above as a result of the violation of his Fourth Amendment rights.

## COUNT II: 42 U.S.C. § 1983 – Fourteenth Amendment Equal Protection Clause (Mr. Williams)

108.     Plaintiff realleges and reincorporates the preceding paragraphs as if fully restated herein.

109.     Had Mr. Williams been White, none of this would have happened as Defendants would not have felt comfortable beating a fifty-five-year-old, disabled, White man.

110.     Defendants McCaw, Gushen, and Hofer felt comfortable treating Mr. Williams in this manner because of the unconstitutional custom or policies of Defendant City of Warren to discriminate against people of color.

111.     This is a long-standing policy that has played out time and time again.

## COUNT III: 42 U.S.C. § 1983 – First Amendment Retaliation (Mr. Williams)

112.     Plaintiff realleges and reincorporates the preceding paragraphs as if fully restated herein.

113.     Mr. Williams engaged in expressive conduct when he extended his arms out of the vehicle to demonstrate that he was unarmed and not a threat.

114.     For some unknowable reason, Defendant McCaw was angered by Mr. Williams' expressive conduct.

115.     Defendant McCaw decided to order Mr. Williams out of his car "since you want to come out, come on out."

116.     Mr. Williams clearly had not attempted to exit his vehicle.

117.     Defendant McCaw also later indicated that he was angry that Mr. Williams had told him how to do his job – in reference to Mr. Williams telling him that he was supposed to ask for his license and registration.

118.     Other than racial animus, or simple malice, there is no reasonable explanation for Defendant McCaw's conduct.

### COUNT IV: State Law – Elliott-Larsen Civil Rights Act (Mr. Williams)

119.     Plaintiff realleges and reincorporates the preceding paragraphs as if fully restated herein.

120.     Had Mr. Williams been White, none of this would have happened as Defendants would not have felt comfortable beating a fifty-five-year-old, disabled, White man.

121.     Defendants McCaw, Gushen, and Hofer felt comfortable treating Mr. Williams in this manner because of the unconstitutional custom or policies of Defendant City of Warren to discriminate against people of color.

122.     This is a long-standing policy that has played out time and time again.

### COUNT V: State Law – Persons with Disabilities Civil Rights Act MCL § 37.1101 *et seq*. (Mr. Williams)

123.     Plaintiff realleges and reincorporates the preceding paragraphs as if fully restated herein.

124.     The Michigan Persons With Disabilities Civil Rights Act ("PWDCA") prohibits the denial of full and equal enjoyment of public services, facilities,

and privileges regardless of disability or adaptive devices or aids. MCL §
37.1302.

125.     Mr. Williams was disabled and required the use of adaptive aids or
devices within the meaning of MCL § 37.1302.

126.     Police provide a public service – including that of arrest.

127.     Mr. Williams was denied equal access to being arrested because he was
disabled and required adaptive aids or devices.

128.     Defendants did not give Mr. Williams a chance to comply with their
orders because of his disability.

129.     Defendants beat Mr. Williams and dislocated his elbow because of his
disability.

**COUNT VI: State Law – Gross Negligence (Mr. Williams)**

130.     Plaintiff realleges and reincorporates the preceding paragraphs as if
fully restated herein.

131.     Defendants McCaw, Gushen, and Hofer each owed Mr. Williams a duty
of care while arresting him.

132.     Defendants McCaw, Gushen, and Hofer were each made aware that Mr.
Williams was handicapped.

133.     Defendants McCaw, Gushen, and Hofer completely ignored this when
arresting Mr. Williams.

134.     Defendants McCaw and Hofer also completely ignored Mr. Williams cries that they were breaking his arm.

135.     Defendant McCaw and Hofer went so far as to say that they did not break his arm.

136.     Defendants' conduct was outrageous and unreasonable given Mr. Williams' handicap, his repeated offers to comply, and cries of pain.

**COUNT VII: State Law – Intentional Infliction of Emotional Distress (Mr. Williams and Mrs. Williams)**

137.     Plaintiffs reallege and reincorporate the preceding paragraphs as if fully restated herein.

138.     Defendants McCaw, Gushen, and Hofer acted outrageously by ignoring the repeated pleas of both Mr. and Mrs. Williams that Mr. Williams was handicapped and treating Mr. Williams like a resisting suspect when he was unable to comply with the orders given.

139.     Defendant Gushen acted outrageously by punching Mr. Williams in the back of his head when Mr. Williams was unable to comply with the order to exit his vehicle.

140.     Defendants McCaw and Hofer acted outrageously by ignoring Mr. Williams' pleas that they were breaking his arm before dislocating his arm.

141.     Ignoring the pleas of Mr. and Mrs. Williams' was reckless – especially considering the disability plate on Mr. Williams vehicle that provided additional evidence that Mr. Williams was handicapped.

142.     Defendants' conduct was not in good faith.

143.     Both Mr. and Mrs. Williams suffered significant mental and emotional injuries from the experience.

144.     Mrs. Williams was forced to helplessly watch her new husband be beaten by the police for no reason.

145.     Mr. Williams was beaten, despite him making every attempt to avoid a negative interaction with the police.

146.     Now the Williams celebrate two anniversaries on the same day – their wedding and the beating of Mr. Williams.

147.     The Williams plan to move from Warren as a result of this incident and their fear of the Warren Police Department.

**WHEREFORE**, Plaintiff respectfully requests that this Court find that Defendants violated his rights and injured him in the manner set forth above and award him:

a.  Nominal, compensatory, punitive, and exemplary damages;

b.  Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and MCL § 37.1606;

c. A declaration that the policies and procedures of Defendant City of Warren violated Mr. Williams rights in the manner set forth above; and

d. Any other relief this Court deems just and proper.

### Jury Demand

Plaintiff requests a jury trial on all claims triable before a jury.

Respectfully submitted,

**OLIVER BELL GROUP**

Dated: March 14, 2025

/s/ Paul Matouka
Paul Matouka (P84874)
Oliver Bell Group
Attorney for the Plaintiffs
50 W. Big Beaver Rd.
Suite 200
Troy, MI 48084
notifications@oliverlawgroup.com